## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK S. O'DELL, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>       v.<br><br>BERKSHIRE BANK, a Massachusetts Trust Company,<br><br>        Defendant. | Case No.   5:24-cv-652 (DNH/TWD)<br><br>**CLASS ACTION COMPLAINT FOR AIDING AND ABETTING FRAUD**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Mark S. O'Dell ("Plaintiff" or "Mr. O'Dell") brings this Complaint individually and on behalf of all others similarly situated, against Defendant Berkshire Bank ("Berkshire" or "Defendant"),  and alleges as follows:

### INTRODUCTION

1.       For more than three decades, M. Burton Marshall ("Marshall") operated a series of businesses and owned scores of properties in Madison County, New York. Marshall's business and professional endeavors included tax return preparation, self-storage, printing, insurance brokering, property maintenance, and real estate rentals.

2.       However, during the same time, Marshall's primary endeavor was to accumulate money by soliciting his friends, neighbors, customers, and/or clients to invest in an illegal fund he devised and promoted (the "Marshall Fund") by offering promissory notes with an 8% annual return (the "Notes").

3.       In order to pay investors their promised 8% annual return and/or repay any principal demanded by investors at the maturities for prior Notes, Marshall would solicit

investors to invest additional funds in new Notes.  He would then pay debts owed from the prior Notes with funds deposited for new Notes. In other words, through the Marshall Fund, Marshall created and ran a fraudulent investment scheme paying prior investors mostly with newly invested funds – what is commonly referred to as a Ponzi or pyramid scheme (the "Ponzi scheme").

4.      By April 20, 2023, the Marshall Fund owed about 900 Notes to investors valued at over $90 million. On that date, Marshall filed a Petition for Relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court, which is currently pending as *In re M. Burton Marshall*, Case No. 23-60263-6-PGR (the "Bankruptcy Action").

5.      Over approximately the past ten years, the Marshall Fund was maintained in a single personal checking account under the name of M. Burton Marshall at Berkshire (the "Berkshire Checking Account"). Deposits of investors from the Notes issued by Marshall were commingled in the Berkshire Checking Account. Distributions to Notes' investors were then debited from the Berkshire Checking Account.

6.      During that approximately ten year period, Berkshire knew that Marshall's deposits of funds acquired from investors in new Notes was the primary source of credits to the Berkshire Checking Account. Berkshire substantially assisted Marshall in commingling those deposits of new investor funds in the Berkshire Checking Account, which were then withdrawn for Marshall's payments of interest and other debts owed to existing Marshall Fund investors and/or holders of existing Notes.

7.      Not only were virtually all of the Notes' related transactions over the past ten years completed through the Berkshire Checking Account, but also most of Marshall's personal and other business transactions were conducted through the same Berkshire Checking Account.

8.     Both Marshall and Berkshire handsomely profited from the Ponzi scheme Marshall ran through his personal Berkshire Checking Account.

9.      As further alleged herein, Berkshire possessed actual knowledge of the massive fraud that Marshall was perpetrating through the Berkshire Checking Account, and, substantially assisted Marshall in his fraudulent activities in using new investor money to pay debts of existing investors. Rather than exposing Marshall's Ponzi scheme, Berkshire substantially assisted Marshall in the continuing operation of his fraud and profited from it.

10.    Plaintiff is among those investors who lost significant savings as a result of Marshall's Ponzi scheme and Berkshire's knowing participation in that scheme. It is apparent that the investor victims of the Marshall Fund will not receive full restitution through the Bankruptcy Action. Plaintiff brings this action on behalf of himself and for the benefit of all other similarly situated investor victims. Plaintiff seeks to hold Berkshire liable for aiding and abetting Marshall's fraud and require Berkshire to make amends to him and his fellow investor victims.

## **JURISDICTION AND VENUE**

11.    This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), codified at 28 U.S.C. § 1332(d)(2).  At least one member of the Class is a citizen of a different state than Defendant, there are more than one hundred members of the Class, and the aggregate amount in controversy exceeds five million dollars ($5,000,000.00).

12.    This Court has personal jurisdiction over Defendant. Berkshire is a Massachusetts trust company, having its principal office for the transaction of business in the State of New York at 30 South Pearl Street in the City and County of Albany, New York.

Berkshire continuously and systematically operates, conducts, engages in, and carries on business in New York.  This Court also has specific personal jurisdiction over Defendant because Berkshire's wrongful conduct occurred in New York and in this District, including the conduct by which Plaintiff was victimized.

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) because Berkshire's wrongful conduct or the effects of its wrongful conduct have occurred in large part in this Judicial District.

## PARTIES

14.     Plaintiff Mark S. O'Dell is a citizen of New York, who resides in the village of Morrisville in Madison County, New York.

15.     Plaintiff invested in the Marshall Fund, and suffered damages as a result of Berkshire's aiding and abetting of Marshall's fraud as alleged herein.

16.     Defendant Berkshire Bank is a Massachusetts trust company that has its company headquarters and principal office for the transaction of business located at 60 State Street, Boston, MA, in the County of Suffolk, Massachusetts.

17.     Berkshire had a branch located at 212 Main Street, Oriskany Falls, NY 13425 (the "Oriskany Falls Branch") at which Marshall maintained the Berkshire Checking Account that was used to perpetrate the Marshall Fund Ponzi scheme.

18.     On information and belief, Berkshire closed the Oriskany Falls Branch in or about Autumn 2021, after which time the Berkshire Checking Account was maintained through the Berkshire Bank branch located at 8491 Seneca Turnpike, New Harford, NY 13413 (the "Seneca Turnpike Branch").

19.     Marshall maintained most, if not all, of his bank accounts at Berkshire Bank for

4

approximately ten years prior to his filing of the Bankruptcy Action.

20.     According to its 2023 annual report, Berkshire was founded in 1846, and presently holds total assets of over $12.4 billion. It operates 96 financial centers in New England and New York.  Its workforce of approximately 1,300 employees service lines of business that include Commercial and Private Banking, Retail Banking, Consumer Lending, SBA Lending and Wealth Management.

## **FACTUAL ALLEGATIONS**

### A.     **The Marshall Ponzi Scheme**

21.     Operating out of Hamilton, New York, M. Burton Marshall personally incurred more than $90 million in unsecured debt by soliciting approximately 900 of his friends, neighbors, clients, and other acquaintances to invest in unsecured promissory Notes that promised an 8% annual interest rate.

22.     Marshall represented to investors that money he raised from the Notes would go into the Marshall Fund and be used for real estate investments.  However, for approximately ten years prior to his commencement of the Bankruptcy Action on April 20, 2023, the investors' money was not deposited into one or more segregated Marshall Fund bank accounts to fund real estate investments. That money instead was deposited directly into Marshall's personal checking account with Berkshire. From that single Berkshire Checking Account, Marshall paid his personal and business debts and expenses – including making payments Marshall owed on the Notes he solicited and issued to his investors.

23.     Marshall solicited and accepted investments and/or loans from Plaintiff and class members with the intent to defraud them. Marshall did not tell Plaintiff or class members that their investments and/or loans were being used – with Berkshire's substantial assistance – to make periodic payments to previous investors and/or lenders, nor did Marshall tell Plaintiff or class

members until the filing of the Bankruptcy Action that Marshall lacked sufficient capital to meet his obligations to pay those who invested in the Notes unless he continued to solicit and receive money from new investors and/or lenders.

24.     Thus, through the operation of the Berkshire Checking Account, Marshall perpetrated a $90 Million Ponzi scheme using the new investor money he deposited into the Berkshire Checking Account to make withdrawals out of the same Berkshire Checking Account in order to pay the amounts due to investors holding older Notes.  The primary source of the funds used to make withdrawals to pay distributions to Marshall Fund investors were deposits made from the checks and wires received from investors in new Notes issued by Marshall.

25.     Marshall's Ponzi scheme unraveled when he became hospitalized in January 2023.  Marshall's Ponzi scheme was so reliant on his raising new investor money to pay existing investors that it could not persist for more than a few months following his hospitalization, forcing Marshall to file his petition to seek bankruptcy protection in April 2023.

26.     Marshall's schedules and submissions in the Bankruptcy Action disclose assets of $21,854,009.89 against liabilities of $92,746,873.06. Marshall's bankruptcy schedules and submissions also reveal that the amounts due and owing to investors in the unsecured promissory Notes total over $90 million of Marshall's liabilities.

27.     Thus, even after all efforts are made to return as much value as possible to investors, Marshall's Ponzi scheme is likely to cost investors in the Notes more than $70 million or more.

B.     **Berkshire's Know Your Customer Legal Requirements**

28.     Federal law requires banks to know their customers and understand their customers' banking behavior. See 31 C.F.R. §§ 1020.220(a)(1), (2). Thus, Berkshire is required to collect

information about the holder of each account. To help fulfill this obligation, when a business opens an account, Berkshire obtains information concerning the individuals who control the account.

29.     Federal regulations, including 12 C.F.R. § 21.21, require Berkshire to develop, administer and maintain a program to ensure compliance with federal Anti-Money-Laundering (AML) laws. The program is approved by the bank's board of directors and: (1) provides a system of internal controls to ensure compliance at all times, (2) provides for independent testing of the bank's ongoing compliance, (3) designates an individual to coordinate and monitor compliance, and (4) provides training for appropriate personnel.

30.     Berkshire also maintains a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a means of identifying unusual or suspicious transactions for each customer. The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

31.     Berkshire designates a senior bank official to be the compliance officer responsible for coordinating and monitoring compliance with federal AML laws. The compliance officer, in turn, designates an individual at each office or branch to monitor the bank's day-to-day compliance, including the branches Marshall used to operate the Berkshire Checking Account.

32.     The federal government established the Federal Financial Institutions Examination Council ("FFIEC") in 1979. Berkshire receives guidance from the FFIEC, which is tasked with ensuring consistency in AML compliance efforts across the banking sector. FFIEC publications describe certain "red flags" that indicate possible money laundering schemes and other misconduct mandating further inquiry. Examples of these suspicious indicia related to Marshall's banking

activities at Berkshire include, but are not limited to:

      a.      "Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts."

      b.      "Customer uses a personal account for business purposes."

      c.      "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

      d.      "Customer makes high value transactions not commensurate with the customer's known incomes."

      e.      "A large volume of … funds transfers is deposited into … an account when the nature of the accountholder's business would not appear to justify such activity."

      f.      "The stated occupation of the customer is not commensurate with the type or level of activity."

      g.      "Goods or services purchased by the business do not match the customer's stated line of business."

      h.      "Goods or services, if identified, do not match profile of company provided by respondent bank or character of the financial activity, . . ."

      i.      "Payments or receipts with no apparent links to legitimate contracts, goods, or services are received."

      j.      "Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number."

      33.      Consistent with FFIEC guidance, Berkshire maintains a system of controls sufficient to identify broad patterns of account activity, sometimes spanning several accounts. The

substantive nature of the transactions, the relationships between the transacting parties, and the parties' identities, are all subject to this examination.

34.     Berkshire contextualizes its scrutiny, analyzing suspicious activity against the backdrop of industry norms and each customer's background. Berkshire is expected to use external sources of information like the internet, commercial database searches, and direct inquiries to ascertain the identity of originators and beneficiaries, and/or the nature of suspicious account transactions.

35.     Berkshire collects and maintains information about its customers and their banking behavior in order to, among other things, detect and prevent money laundering and fraud and to protect itself from third party liability and reputational harm.

36.     Berkshire maintains procedures to know the identity of each customer and to collect information about the holder of each account. 31 C.F.R. §§ 1020.220(a)(1), (2).

37.     The information that Berkshire collects about a customer opening a bank account for the transaction of business includes the purpose and nature of the business, anticipated activity in the account, where the customer expects to transact business, and the products and services commonly used by the customer.

38.     Using the information collected, as well as external resources like internet search engines and public and commercial record databases, Berkshire creates an initial client profile and assigns a compliance-related risk rating. Neither the profile, nor the risk rating, is final or static. When Berkshire becomes aware that customer information has materially changed, its internal controls require updating that information and, where appropriate, reassessing the customer's risk profile or rating. One of the ways in which Berkshire becomes aware of such changes is when the customer's transactions appear inconsistent with the bank's understanding of the nature and

purpose of the account.

39.     Berkshire also maintains internal controls to ensure ongoing compliance with federal AML law. These include independent testing of the bank's compliance, regular monitoring of compliance, and training of personnel. These controls also include customer due diligence programs to prevent and detect money laundering.

40.     Through these programs, Berkshire obtains information that gives it an understanding of the unique financial activity of its customers. Likewise, Berkshire can predict the type and frequency of transactions in which its customers are likely to engage, including the dollar volume and transaction volume typical of each account. This knowledge is used to identify unusual and suspicious transactions.

41.     Berkshire employees are trained to monitor and understand customer account activities.  Berkshire also makes employees' compliance with banking regulations, and knowledge of AML guidelines, conditions of their employment, and Berkshire incorporates these concepts into job descriptions and performance evaluations. Berkshire gives AML training to all personnel whose duties may require such knowledge, including tellers and wire room personnel, enabling them to detect money laundering and fraud. In addition, supervising personnel, specially designated by Berkshire's chief compliance officer, oversee the day-to-day implementation of the bank's risk management framework at the individual branches.

42.     Berkshire's Code of Business Conduct reinforces the bank's compliance policies, and orders any employee, officer or director of Berkshire having information about "any actual or suspected wrongdoing, including fraud (which is defined as any act of deception intended to result in financial gain for the perpetrator or financial loss to another person or company) or embezzlement, must report the ... wrongdoing/suspected wrongdoing for further investigation....

In the case of fraud/suspected fraud, it is preferable for the report to be made to the SEVP of the business unit and the Financial Investigations Unit (FIU). However, fraud can also be reported to an employee's manager, Human Resources, or the General Counsel."

43.     In addition, Berkshire continuously monitors customer account activity as outlined by established procedures, including reviewing complex and complicated alerts generated from its fraud detection software platform provided by Verafin, Inc. ("Verafin"). Verafin's fraud detection software automatically reviews transactions against customers' backgrounds and transaction histories, compares account activity against AML and other compliance red flags, and automatically detects and analyzes abnormal or risky behavior. When the software identifies activity warranting further review or escalation, it alerts bank personnel.

### C.     Berkshire Aided and Abetted Marshall's Ponzi scheme

44.     Marshall's Ponzi scheme only succeeded for so long because Marshall was able to limit access to his personal and business financial information, including that of the Marshall Fund. Among the select few who did have access was Berkshire.

45.     On information and belief, the Berkshire Checking Account was the largest and most profitable account, and had the most transactional activity, of Berkshire's Oriskany Falls branch until Berkshire's management directed the shutdown of the Oriskany Falls branch in Autumn 2021.

46.      Thereafter, on information and belief, the Berkshire Checking Account and Marshall's other Berkshire accounts were transferred to the Seneca Turnpike Branch, at which the same Berkshire Checking Account was among the largest and most profitable accounts, and had the most transactional activity.

47.     As detailed above, Berkshire's legal obligations and internal compliance

procedures required extensive customer due diligence, especially for large depository customers like Marshall. Client monitoring is particularly important when large amounts of money are involved, which creates a greater risk that the bank's services are being used for illicit purposes.

48.     Berkshire's "know your customer" legal obligations and internal compliance procedures were ongoing.  They required Berkshire to familiarize itself with Marshall, the nature of Marshall's business operations, the source and legitimacy of his funds, and the purpose of his bank accounts and ongoing financial transactions. They also required Berkshire to monitor Marshall's transactions in the Berkshire Checking Account and report suspicious account activity.

49.     In the course of performing its customer due diligence operations, Berkshire learned that Marshall was conducting fraudulent activity through the Berkshire Checking Account – using deposits from new investors to pay existing investors – as well as using investor deposits to pay his personal and business expenses.

50.     Berkshire monitored and knew of Marshall's colossal commingling of investor funds in the Berkshire Checking Account from the multitude of deposits Marshall made of new investor money, and because Marshall quickly withdrew new investor funds to pay distributions to prior investors as well as to pay various personal and business debts and expenses.

51.     Berkshire's employees also must have observed that many incoming checks and/or wires deposited in the Berkshire Checking Account contained such payor descriptions and designations as "investment," "investment note," "promissory note," "8%," and "Note."

52.     Several of Marshall's investor victims held accounts at Berkshire and transferred funds by and between themselves and Marshall, providing Berkshire complete transparency of transactions between those investor victims and Marshall.

53.     On information and belief, Marshall was a well-known member of the local

community who worked closely with the tellers and managers at Berkshire's Oriskany Falls Branch and Seneca Turnpike Branch, and through those Berkshire employees, Berkshire knew that the Marshall Fund was raising money through the Notes from local residents, which were deposited in the Berkshire Checking Account for the purpose of the Marshall Fund's real estate investments, and that those investor funds in the Berkshire Checking Account were not for Marshall's own personal use or expenses.

54.    Berkshire must have known that investors in the Marshall Fund did not receive any accompanying offering documents, and that Marshall did not utilize any legal counsel, auditors or any other third party professionals that typically would be involved in securities offerings.

55.    Berkshire further knew that at no time was Marshall or any of his companies registered with the Securities and Exchange Commission, Financial Industry Regulatory Authority, or any other governmental agency to sell, create, promote or operate as a securities broker-dealer, seller of securities or otherwise allowed to engage in the sale of securities as a matter of law.

56.    Berkshire's knowledge of Marshall's Ponzi scheme was also an inevitable consequence of several factors that made the scheme obvious to a bank in Berkshire's position:

      a.    All of Marshall's bank accounts were Berkshire accounts, giving Berkshire a full view of Marshall's financials;

      b.    Berkshire knew Marshall's businesses were predominantly sole proprietorships without a corporate form of business ownership, and that Marshall was personally running and "doing business as" those companies in his own individual capacity;

      c.    All of Marshall's various commercial and professional enterprises

conducted financial transactions through the Berkshire Checking Account, a personal account which Berkshire knew was a highly irregular and unusual way for transacting the tens of millions of dollars involved in operating his different lines of business;

d.      Berkshire knew that the frequency of transactions that occurred in the Berkshire Checking Account were highly unusual in nature for a personal checking account;

e.      Many deposits in the Berkshire Checking Account originated from checks and/or wires that Berkshire must have known to be from investors in the Notes because many incoming checks and/or wires contained such payor descriptions and designations as "investment," "investment note," "promissory note," "8%," and "Note";

f.      Berkshire knew that the Berkshire Checking Account was being used to pay both Marshall's personal and business expenses and debts;

g.      Berkshire knew that the Berkshire Checking Account showed that Marshall required a regular influx of substantial amounts of new investor money to meet the withdrawals he was making in that account;

h.      Berkshire knew that many of the checks and/or wire transfers credited to the Berkshire Checking Account were in large, round number dollar amounts that signaled a well-understood pattern of fraudulent financial activities;

i.      Marshall's colossal commingling of funds to carry out the Marshall Fund Ponzi scheme was obvious from the various deposits and withdrawals that occurred in the Berkshire Checking Account that was closely monitored by Berkshire; and

j.      Berkshire's fraud detection software platform from Verafin and/or other vendors must have generated numerous alerts of unusual activities over a period of many years in the Berkshire Checking Account that required investigation and resolution by its AML, compliance and/or financial investigation unit personnel.

57.    Although Berkshire knew Marshall was defrauding investors and using new investors' contributions to pay previous investors, it substantially assisted and profited from – rather than expose – Marshall's fraudulent activities.

58.    Berkshire provided the banking assistance that Marshall needed to successfully operate his Ponzi scheme. Among other things, Berkshire received new investor funds deposited into the Berkshire Checking Account and permitted those funds to be commingled and then withdrawn for Marshall's payment of debts owed to existing Marshall Fund investors and/or holders of existing Notes.

59.    Despite being privy to the above-described wrongdoing by Marshall, Berkshire did not terminate its relationship with Marshall or take steps to stop his fraudulent scheme. Instead, Berkshire continued to provide Marshall with any and all banking services he required and to facilitate improper transfers of the Notes' investor funds, thus allowing Marshall to continue to operate his Ponzi scheme for approximately ten years after he began banking with Berkshire.

**D.**    **Plaintiff's Investment in the Marshall Fund**

60.    On or about April 4, 2022, Plaintiff invested in the Marshall Fund by providing a check payable to "Burt Marshall" in the amount of Sixty Thousand Dollars ($60,000.00) (the "O'Dell Investment Check").

61.    The memo line on the O'Dell Investment Check expressly stated that the check payment was for a "promissory note" investment.

62.     The O'Dell Investment Check was endorsed by "Miles M Marshall Inc." for account number "692301" and deposited directly into the Berkshire Bank Checking Account.

63.     Berkshire knew the $60,000.00 in funds paid by the O'Dell Investment Check was new investor money in the Marshall Fund when Berkshire accepted that check for deposit into the Berkshire Checking Account.

64.     Berkshire knew and substantially assisted Marshall in commingling the $60,000.00 of O'Dell's new investor funds with other investor funds in the Berkshire Checking Account.

65.     Berkshire knew and substantially assisted Marshall in withdrawing the $60,000.00 invested by O'Dell for a promissory note from the Berkshire Checking Account to pay, among other things, distributions to other investors in the Marshall Fund and Marshall's own personal expenses.

66.     As a direct and proximate result of Berkshire knowingly and substantially assisting Marshall in using the $60,000.00 invested by O'Dell to pay for, among other things, distributions to other investors in the Marshall Fund and Marshall's own personal expenses, O'Dell incurred substantial monetary damages.

## CLASS ACTION ALLEGATIONS

67.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff seeks to pursue his claims on behalf of a class of similarly situated persons.  The parameters of the class may be refined through discovery and will be subject to Court approval and modification, but for purposes of this complaint, Plaintiff proposes the following class definition:

> *All persons who invested money with and/or loaned money to M. Burton Marshall during the period Marshall maintained the Berkshire Checking Account.*

68.     Plaintiff further proposes that the following persons be excluded from any certified class: Defendant, its current or former officers, directors, trustees, legal representatives, employees; any and all companies or entities affiliated with Defendant, their current or former officers, directors, legal representatives, employees, parent companies, subsidiaries, affiliates, predecessors, successors, or assigns; and all judicial officers and associated court staff assigned to this case and their immediate family members.

69.     The proposed class meets the requirements for class certification pursuant to Rule 23(a) and Rule 23(b)(3).

70.     *Numerosity*: The class is sufficiently numerous such that individual joinders are impracticable. The schedules and submissions in the Bankruptcy Action suggest the number of direct victims of Marshall's Ponzi scheme to be approximately 900.

71.     *Commonality*: Plaintiff's and class members' claims against Berkshire present common questions of law and fact, including:

    a.      What Berkshire learned about Marshall's Ponzi scheme and when it learned it;

b.      Whether the information Berkshire knew about Marshall's Ponzi scheme constitutes actual knowledge under the law of aiding and abetting;

c.      What transactions or other activities Berkshire performed for Marshall and his businesses, including, without limitation, the Marshall Fund;

d.      Whether Berkshire's activities constitute substantial assistance under the law of aiding and abetting.

72.    *Typicality*: Plaintiff's claims against Berkshire are typical of the class's claims. Plaintiff and class members were all victims of Marshall's Ponzi scheme, each has claims against Berkshire for aiding and abetting that scheme, and each claim will depend on common proof that Berkshire knew about Marshall's Ponzi scheme and substantially assisted that scheme.

73.    *Adequacy*: Plaintiff is a member of the class and will fairly and adequately protect its interests. Plaintiff's interests are aligned with those of the class, as each seeks to recover from Berkshire for aiding and abetting the Ponzi scheme that caused them financial harm.

74.    *Predominance*: The common questions identified above are likely to predominate at trial when compared to any individualized issues that may arise. The major issues upon which Berkshire's liability depends – namely, whether Berkshire had actual knowledge of Marshall's Ponzi scheme and substantially assisted that scheme – are each susceptible to generalized proof that would establish Berkshire's liability as to all class members through a single trial.

75.    *Superiority*: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Successfully prosecuting class members' claims is likely to require intensive discovery of multi-billion dollar financial institution, review of large amounts of electronically stored information, and hiring of financial experts to explain and interpret the significance of both Marshall's and Berkshire's records. These matters are best handled through

unified class-wide representation, which can be conducted on a contingency basis and offers class members economies of scale unavailable in individual proceedings. A class action also has the benefit of comprehensive supervision by a single court and will avoid the risk of inconsistent results.

## CLAIM FOR RELIEF

### Count I

### Aiding and Abetting Fraud

76.     Plaintiff incorporates by reference each and every preceding paragraph as if fully set forth herein.

77.     This Count is asserted by Plaintiff on behalf of himself and the proposed class against Defendant for aiding and abetting Marshall's fraud.

78.     Plaintiff and class members were each victimized by the fraudulent Ponzi scheme orchestrated by Marshall. Marshall solicited and accepted investments and/or loans from Plaintiff and class members with the intent to defraud them. Marshall did not tell Plaintiff or class members that their investments and/or loans were being used – with Berkshire's substantial assistance – to make periodic payments to previous investors and/or lenders, nor did Marshall tell Plaintiff or class members until the filing of the Bankruptcy Action that Marshall lacked sufficient capital to meet his obligations to pay those who invested in the Notes unless he continued to solicit and receive money from new investors and/or lenders.

79.     Berkshire aided and abetted Marshall's fraud and is accordingly liable for damages caused to Plaintiff and class members that resulted from Marshall's fraud..

80.     As previously alleged, Berkshire learned of and possessed actual knowledge of Marshall's fraudulent Ponzi scheme in the course of performing its customer-due-diligence

obligations and closely monitoring the Berkshire Checking Account.

81.    Berkshire knew and understood that Marshall's atypical banking transactions with Notes' investors as detailed above were fraudulent and lacked any legitimate economic or business purpose.

82.    As previously alleged, Berkshire substantially assisted Marshall's fraud by providing the banking assistance that Marshall needed to successfully operate his Ponzi scheme with knowledge of its unlawfulness. Among other things, Berkshire knowingly received deposits of new investor funds into the Berkshire Checking Account, commingled those funds, and then allowed the funds from new investments to be withdrawn for Marshall's payments of interest and other debts owed to existing Marshall Fund investors and/or holders of existing Notes, as well as payments of various personal and business expenses incurred by Marshall. Thus, Berkshire knowingly and substantially assisted the fraud that enabled Marshall to perpetrate and to conceal the Ponzi scheme for approximately ten years.

83.    As a result of Berkshire's aiding and abetting of fraud, Plaintiff and class members have been damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)        Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class and Silver Law Group and Peiffer Wolf Carr Kane Conway & Wise, LLP as Class counsel;

(b)        Awarding compensatory damages in favor of Plaintiff and the other Class members against Berkshire for all damages sustained as a result of Berkshire's wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)        Awarding Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

(d)        Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 13, 2024                          Respectfully submitted,

SILVER LAW GROUP

By: /s/ *Scott L. Silver*
     Scott. L. Silver

11780 W. Sample Road
Coral Springs, FL 33065
Tel.: (954) 755-4799
Fax: (954) 755-4684
**Scott L. Silver, Esq.**
Email: ssilver@silverlaw.com
**Peter M. Spett, Esq., Of Counsel**
Email: pspett@spettlaw.com
**Ryan A. Schwamm, Esq.** (will seek
admission pro hac vice)
Email: rschwamm@silverlaw.com

PEIFFER WOLF CARR KANE CONWAY
& WISE, LLP

95 Allens Creek Road, Bldg. 1, Ste. 150
Rochester, NY 14618
Tel: (585) 310-5140
Fax: (585) 397-3745
**Jason J. Kane, Esq.** (will seek admission
pro hac vice)
Email: jkane@peifferwolf.com
**Daniel B. Centner, Esq.** (will seek
admission pro hac vice)
Email:  dcentner@peifferwolf.com
**Grace A. Van Hancock, Esq.** (will seek
admission pro hac vice)
Email: gvanhancock@peifferwolf.com

*Counsel for Plaintiff Mark S. O'Dell*